FRASER TREBILOCK DAVIS & DUNLAP, PC v BOYCE TRUST 2350

Docket Nos. 302835, 305149, and 307002. Submitted December 4, 2013, at Lansing. Decided February 6, 2014, at 9:05 a.m. Leave to appeal sought.

Fraser Trebilcock Davis & Dunlap, PC, brought an action in the Midland Circuit Court against Boyce Trust 2350, Boyce Trust 3649, and Boyce Trust 3650, seeking to collect unpaid attorney fees. Following a jury trial, the court, Jonathan E. Lauderbach, J., entered a judgment in favor of plaintiff in the amount of $73,501.90, inclusive of damages, taxable costs, and prejudgment interest. Defendants appealed. (Docket No. 302835). The trial court then granted plaintiff's motion for case-evaluation sanctions pursuant to MCR 2.403(O). Defendants brought two separate appeals from the attorney-fee orders. (Docket Nos. 305149 and 307002). The appeals were consolidated by the Court of Appeals.

The Court of Appeals *held*:

1. The trial court did not err by determining that defendants' special requested jury instruction was not necessary because the model jury instructions that were given adequately informed the jury on plaintiff's burden of proof. There was no instructional error.

2. The trial court did not abuse its discretion by refusing to permit certain rebuttal testimony proposed by defendants.

3. A law firm, such as plaintiff, represented by its own attorneys is not a pro se litigant for purposes of entitlement to attorney-fee sanctions under MCR 2.403(O). With regard to self-representation, an organization is not comparable to a pro se litigant because the organization is always represented by counsel, whether in house or pro bono, and thus, there is always an attorney-client relationship.

4. MCR 2.403(O)(6)(b) requires a trial court to award a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial court for services necessitated by the rejection of a case evaluation. The court rule does not require that the attorney fee be incurred, it requires only that the trial court determine a reasonable attorney-fee amount according to a pre-

scribed method, namely, by determining the hourly or daily rate for services necessitated by the rejection of the case evaluation. Accordingly, an award of case-evaluation sanctions must include an award of attorney fees to be determined by this method.

5. Actual costs arising from postjudgment proceedings that occur more than 28 days after the judgment may be awarded as case-evaluation sanctions if the proceedings are causally connected to the party's rejection of the case evaluation.

6. Plaintiff's legal work opposing defendants' motion for a new trial was necessitated by defendants' rejection of the case evaluation. The proceedings to obtain the award of case-evaluation sanctions were not necessitated by defendants' rejection of the case evaluation. The case-evaluation proceedings were complicated by defendants' assertion that plaintiff, a law firm represented by its own members, was not entitled to receive attorney fees and by defendants' objections to the amount of attorney fees sought by plaintiff. Because the legal issue of plaintiff's entitlement to attorney fees for services rendered by its own attorneys was a close one, not clearly settled by Michigan caselaw, and the trial court awarded plaintiff only approximately 30% of its requested attorney fees, under the circumstances of this case, there was an insufficient causal nexus between defendants' rejection of the case evaluation and the resources plaintiff expended claiming attorney fees. Therefore, the supplemental attorney-fee award of $22,703.95 ($21,253.60 plus interest of $1,450.35) for expenses sustained from March 4, 2011, to August 11, 2011, is not authorized by MCR 2.403(O). The orders of June 29, 2011, and November 7, 2011, must be reversed to the extent that they authorize case-evaluation sanctions for plaintiff's time devoted to pursuing case-evaluation sanctions.

7. The trial court did not abuse its discretion by determining that $300 was a reasonable hourly fee for attorney Perry, who represented plaintiff. The decision was within the range of principled outcomes.

8. The trial court's award of $80,434 in attorney fees was not outside the range of principled outcomes, notwithstanding that the verdict was only $70,000.

9. The judgment in Docket No. 302835 is affirmed. The award of case-evaluation sanctions in Docket Nos. 305149 and 307002 is affirmed in part and reversed in part to the extent that it encompasses services related to the pursuit of case-evaluation sanctions. The case is remanded to the trial court for the recalculation of case-evaluations sanctions.

Affirmed in part, reversed in part, and remanded.

Murphy, C.J., concurring in part and dissenting in part, agreed with the majority with regard to the jury instruction and evidentiary issues but disagreed with the majority concerning whether plaintiff is entitled to an award of attorney fees as case-evaluation sanctions. An attorney is defined as an agent of another person, therefore, there must be separate identities between the attorney and the client before the litigant may recover actual attorney fees. If a law firm itself becomes embroiled in litigation as a party litigant and proceeds using one or more of its own attorneys, the law firm has in theory employed itself to go forward. It is effectively proceeding *in propria persona* and the firm does not have an identity that is separate from its attorneys for purposes of establishing an attorney-client relationship. There is an absence of a true attorney-client relationship, as required to be entitled to an attorney fee. The trial court's decision to award attorney fees to plaintiff should be reversed, considering there was no attorney fee for purposes of MCR 2.403(O)(6)(b) in light of the missing element of an attorney-client relationship.

1. Actions — Case Evaluations — Case-Evaluation Sanctions — Law Firms — Pro Se Litigants.

A law firm represented by its own attorneys is not a pro se litigant for purposes of entitlement to attorney-fee sanctions under MCR 2.403(O).

2. Actions — Case Evaluations — Case-Evaluation Sanctions — Actual Costs — Attorney Fees.

The party who rejects a case evaluation and subsequently fails to receive a more favorable verdict must pay the opposing party's actual costs, including a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation; there is no requirement that the attorney fee be actually incurred (MCR 2.403(O)(1) and (6)(b)).

3. Actions — Case Evaluations — Case-Evaluation Sanctions — Actual Costs.

A request for case-evaluation sanctions must be filed and served within 28 days after the entry of the judgment or entry of an order denying a timely motion for a new trial or to set aside the judgment; actual costs arising from postjudgment proceedings that occur more than 28 days after the judgment may be awarded

as case-evaluation sanctions if the proceedings are causally connected to the party's rejection of the case evaluation (MCR 2.403 (O)(8)(i) and (ii)).

*Fraser Trebilcock Davis & Dunlap, PC* (by *Michael H. Perry*), for plaintiff.

*W. Jay Brown PLC* (by *W. Jay Brown*) for defendants.

Before: MURPHY, C.J., and FITZGERALD and BORRELLO, JJ.

FITZGERALD, J. Plaintiff law firm brought this action to collect unpaid attorney fees from defendants. After a jury trial, the trial court entered a judgment in favor of plaintiff in the amount of $73,501.90, inclusive of damages, taxable costs, and prejudgment interest. Defendants appeal as of right from that judgment in Docket No. 302835. The trial court subsequently granted plaintiff's motion for case-evaluation sanctions pursuant to MCR 2.403(O). Defendants appeal as of right from the attorney fees orders in Docket Nos. 305149 and 307002. We consolidated the appeals. We affirm in part, reverse in part, and remand.

DEFENDANTS' TRANSACTIONS TO PURCHASE
HYDROELECTRIC DAMS

Plaintiff's claims for unpaid attorney fees arise from plaintiff's representation of defendants in transactions to purchase and redevelop four hydroelectric dams in the Midland County area. The dams were owned by Synex-Wolverine. Defendants' cotrustee, Lee Mueller, believed the dams could be redeveloped for a profitable operation producing electrical power for Consumer's Energy. The transactions involved defendants' purchasing the entities that operated the dams and also purchasing more than 200 related real estate parcels from

Synex-Wolverine. Synex-Wolverine's 51% shareholder, Scott Goodwin, would also own a 51% interest in the new business, Synex-Michigan, but Goodwin would not have an ownership interest in the real estate. Defendants had sufficient resources to pay for the real estate, but they required financing to purchase the equipment and other business assets. Defendants and their Chicago counsel sought financing from a bank, but defendants obtained a bridge loan from Goodwin's associate, Richard Milsner, to enable the transaction to close before defendants received permanent financing. Milsner advanced the loan on the condition that Goodwin retain a 51% interest in the newly formed business enterprise.

Defendants retained plaintiff to conduct the transactions, which involved complex tax-planning issues. The transactions were subject to an advantageous tax benefit under the Internal Revenue Code, but only if the transactions were completed within a 180-day period. The transactions closed on March 17 and 23, 2006, enabling defendants to realize the tax benefit. Mueller was satisfied with the transactions and plaintiff's work up to the time of the closing, but afterward Mueller came to believe that Goodwin breached his duties to defendants, effectively depriving defendants of the benefit of the bargain. Goodwin made bridge-loan payments directly to Milsner instead of complying with Mueller's instructions to route the payments to defendants. Mueller alleged at trial that Goodwin "locked out" defendants from the dam and thwarted defendants' receipt of payments. Defendants alleged that Goodwin wrongfully failed to disclose to defendants that he had a history of noncompliance with federal energy regulators. Defendants requested plaintiff's services in handling these legal disputes with Goodwin, but they were disappointed with the results. In December

2006, defendants ceased paying plaintiff's attorney fees, leaving an outstanding balance of approximately $74,358.94.

Plaintiff filed a complaint alleging that defendants had paid $161,098.22 in legal fees, but had failed to pay the outstanding balance of $74,358.94. Plaintiff brought claims of breach of contract, account stated, and quantum meruit, and sought damages of $87,632.40, consisting of the unpaid balance, $1,098.22 for costs, and $12,175.24 for a time-price differential. Defendants denied that plaintiff was entitled to the requested damages. In their affirmative defenses, defendants asserted that plaintiff committed the first material breach of contract, that defendants were dissatisfied with the quality of plaintiff's representation, and that plaintiff improperly billed defendants for more hours than were actually spent on the matter, charged defendants for services that were not reasonably necessary, and raised their rates in violation of an agreement to only raise rates with defendants' written approval. Defendants argued that plaintiff had the burden of proving "that each time entry was actually incurred, was accurately recorded in terms of its length, and represented services reasonably necessary for representation of the defendants."

TRIAL

At trial, plaintiff's former associate attorney, John Miller, testified regarding the time he spent on legal matters for defendants. Miller testified that he assisted plaintiff's principal, Edward Castellani, an attorney and certified public accountant, with legal research and other tasks related to business and tax transactions. Miller testified about his hourly rate and the process by which associates submitted their

billable hours to partners for review and approval
before plaintiff billed clients. He denied overstating
his billable hours. Castellani testified that he as-
signed research and writing tasks to Miller because
Miller could perform the work at a lower billing rate.
Castellani testified that Miller's work was satisfac-
tory and that Miller's time records were accurate.
Castellani explained that Douglas Austin, also one of
plaintiff's shareholders, was involved in the project
because of his expertise in real estate law.

Castellani believed that plaintiff's work for defen-
dants was completed after the closing, but defendants
contacted Castellani about continuing problems with
Goodwin. Castellani described "phase two" of plaintiff's
work for defendants as "a lot of negotiations, discus-
sion, and legal maneuvering about how to get [Good-
win] out of the business." Additionally, defendants
needed a source of financing to pay off the bridge loan
advanced by Milsner before the closing.

Castellani testified regarding an e-mail that Mueller
sent to Castellani in response to Castellani's e-mail to
the trustees on September 27, 2006. Mueller stated that
defendants paid $12,000 toward their account that
month, but they would not make additional payments
until Goodwin resumed payments to defendants. The
e-mail did not contain anything critical of plaintiff's
work. Castellani's response stated that defendants'
payment of $12,000 left an $8,000 amount that was
more than 90 days overdue. Castellani warned defen-
dants that plaintiff would terminate their services
when the account became 120 days past due. Castellani
rejected defendants' plan to delay paying plaintiff until
Goodwin made payments to defendants. Castellani tes-
tified that defendants made no payments after Novem-
ber 2006.

Plaintiff questioned Castellani about defense Exhibit 35, an e-mail that Mueller sent to Castellani the first week of December 2006. In the e-mail, Mueller explained that defendants had problems with their ownership of the hydroelectric facilities. Defendants requested that plaintiff cosign a loan in the amount of $3,400,000 to enable defendants to secure the financing needed to continue to operate the dams. In exchange, Mueller offered to pay plaintiff $60,000, plus $75,000 to "pre-fund a Michigan litigation" against Goodwin. On December 18, 2006, Castellani wrote defendants a letter stating that plaintiff was suspending performance of legal services for defendants until defendants made arrangements to pay the balance due. Castellani testified that Mueller responded with an e-mail stating "there are numerous schedules that are apparently not actually part of the purchase agreement." Mueller complained that he could not determine from the transactional record which assets were owned by which entities, other than a list of personal property owned by Synex-Wolverine.

Castellani stated that Mike Perry was the billing attorney who reviewed billings to ensure that they were for reasonably necessary services. Castellani agreed that plaintiff was contractually bound to only bill the client for time actually spent on services that were reasonably necessary. Castellani acknowledged that the contract listed his hourly rate as $230, but he believed that the hourly rate actually charged was $240. Castellani stated that he did not know the reason for the differential because Perry handled billing for the firm. Castellani stated that he billed for activities such as drafting documents, reviewing documents, reviewing laws and rules, conferring with other attorneys regarding the file, and interactions with the client. Castellani

admitted that all the work done by Miller was work that Castellani could have done himself.

On cross-examination, defendants' counsel reviewed testimony that there were two closings, one on March 17 and one on March 23, 2006. When asked whether Mueller was "then happy that it got closed," Castellani answered affirmatively. Defendants asked Castellani if plaintiff resolved defendants' problem relating to their loss of physical control of the dams. Castellani replied that it did not. Castellani stated that Mueller asked for plaintiff's assistance in obtaining permanent financing to resolve this problem. Defendants asked if "Mr. Mueller was unhappy with the failure to solve this problem?" Castellani replied, "I would say he was unhappy with the way his partner was interpreting those documents."

Defendants questioned Castellani extensively regarding items on plaintiff's invoices, suggesting that the tasks listed could not really have required as much time as shown in the billings. Defendants also questioned Castellani regarding the prebilling process in which senior attorneys reviewed associates' time reports and adjusted them before submitting the bills to clients. Castellani denied that Mueller complained that his billings contained too much detail or lacked enough detail.

Douglas Austin, one of plaintiff's shareholders, testified that his area of practice was real estate and that he usually represented developers. Austin stated that defendants received a bridge loan from Milsner to enable them to close before they obtained permanent financing. Austin did not attend the closing because the real estate issues were resolved by that time. Austin testified regarding plaintiff's Exhibit 36, an e-mail that Austin sent to Castellani after the closings. The e-mail stated, "Am extremely happy Lee [Mueller] called at 4:48 to say that the recordings had been completed, and

Eric had revised the commitments to show no require-
ments." It also stated, "Lee wanted me to express to you
and John his gratitude for everything you have done.
He is very pleased."

Lee Mueller testified that he had been a successor
cotrustee of the trusts since 1998. Mueller recognized a
business opportunity for the trusts in redeveloping the
hydroelectric dams. Mueller and Goodwin discussed the
possibility of teaming up to operate the hydroelectric
dams. Defendants had sufficient cash to purchase the
real estate, but not to purchase the business entities.
Defendants' attorney in Chicago, Peter Recchia, agreed
to look into a loan from LaSalle Bank.

Mueller stated that an escrow agent in Chicago paid
plaintiff's bills to defendants. Mueller testified regard-
ing his belief that plaintiff's attorneys inflated their
bills by exaggerating the amount of time spent on
various tasks. For example, Mueller objected to a charge
of $120 for time spent exchanging e-mails about the
bridge loan. Mueller testified that Miller was present at
the closing on March 17, 2006. The closing took several
hours and consisted mostly of participants signing
documents. Mueller believed that Miller was a "specta-
tor." Castellani did not tell Mueller that plaintiff would
charge defendants for Miller's attendance. After Muel-
ler received plaintiff's correspondence, notifying defen-
dants of an outstanding balance of $97,000, he called
Castellani to say he believed that defendants had al-
ready paid all of plaintiff's fees.

Mueller testified regarding the Milsner loan and the
early indications that Goodwin intended to cheat defen-
dants:

> When the mortgage documents were being delivered to
> or transmitted to Ed Castellani for review, they had lan-
> guage in them that was very, very troublesome.

> Mr. Milsner had expressed a view that in order to—that
> in order for him to feel secure about providing a 2.4 million
> dollar bridge loan to the Boyce Trusts, that he would want
> to be assured that these assets, these hydro assets, would
> be managed by somebody that he had confidence in. And
> because Mr. Goodwin was his partner, he wanted assur-
> ances that Mr. Goodwin would be the active manager
> rather than co-trustees of a trust that had never managed
> a hydro project before.
>
> In concept that—that didn't sound out of the ordinary.
> But in practice, I quickly realized that the intent of these
> documents was not to secure Mr. Milsner's temporary
> interest in his loan, but rather these documents were set up
> very cleverly to provide the ability to swindle the Boyce
> Trusts out of the entirety of our three million dollar
> investment.

Mueller confronted Goodwin and reminded him that
Goodwin was not to own any interest in the real estate.
Goodwin relented, and Castellani changed the docu-
ments accordingly. Mueller realized within 30 days that
defendants were being swindled, when Goodwin de-
clined to comply with Mueller's procedures for routing
installment payments to Milsner. Mueller intended for
Goodwin to submit payments to defendants, which
would make payments to Milsner. Mueller knew that
defendants were "in trouble" because Goodwin refused
to make payments and made excuses for not paying.

Plaintiff's counsel remarked that Mueller had
started providing testimony regarding plaintiff's ser-
vices to defendants for the postclosing matters. Counsel
stated:

> I'm not sure where this is going to go, but the quote,
> malpractice, wrongdoing kind of thing is out of the case.
> And if we're talking about reasonable necessity of ser-
> vice, that's one thing. But if we're going to talk about
> Fraser Trebilcock not doing or doing something else and
> whether—other than whether their services were rea-

sonably necessary, I think we're going to be running
afield far (sic) from what the case is all about.

Defendants' counsel responded that the evidence
established that plaintiff billed "a significant amount
of money" in the summer and fall of 2006 "without
getting things done that Boyce Trusts had requested
[plaintiff] to do." Plaintiff responded that the con-
tract between the parties did not provide for contin-
gent fees. The trial court asked defendants to specify
whether Mueller would testify that the task was not
accomplished or that the objective was not accom-
plished. By way of explaining the distinction, the trial
court gave the example of plaintiff billing defendants
for a telephone call that was not made, versus billing
defendants for a phone call that was made, but did
not achieve the result that defendants wanted. The
court commented that, in the latter category, "we're
getting into the subjective expectations of the client
and . . . whether the lawyer was being effective." De-
fendants responded that plaintiff's witnesses testified
about Mueller's failure to object to invoices. The trial
court replied that plaintiff's failure to meet defen-
dants' objectives was not relevant because the con-
tract did not provide for a contingency fee. Defen-
dants argued that plaintiff was "engaged in character
assassination of Mr. Mueller," which would probably
culminate in a closing argument that "Mueller got
himself into a situation and then wasn't happy with
what Fraser Trebilcock did and he didn't pay . . . ."
Defendants asserted that plaintiff "introduced" these
issues, so defendants "should have an opportunity to
rebut these issues." The trial court replied that
defendants were attempting to mislead the jury about
whether the engagement letter empowered defen-
dants to "condition payment not on whether services

were reasonably necessary, but whether [they were] satisfied with the outcome of the services that were provided."

Defendants' counsel acknowledged that the parties' contract did not condition defendants' obligation to pay on their satisfaction with plaintiff's work. But he argued that defendants' satisfaction was relevant to rebutting issues raised by plaintiff. The trial court commented that defendants had previously intended to pay all of plaintiff's legal fees when defendants received the funds they expected. The trial court stated that defendants' objections to the amount of the billings, and their inability to pay the invoices, did not support defendants' position that they were refusing payment because they believed plaintiff was padding the bills with unnecessary or unperformed services. The trial court allowed defendants' counsel to question Mueller regarding defendants' complaint that Goodwin excluded defendants from the dams.

Mueller testified that he discontinued plaintiff's services in November or December 2006. On cross-examination, Mueller stated that his failure to pay invoices from August 2006 until March 2007 represented his disapproval. Mueller stated that he expressed to Castellani his "disapproval of the rapacious nature" and "greedy and excessive billing practices" exercised by plaintiff. Mueller continued to pay bills at a lower rate because he did not want to stop payment and lose plaintiff's services. Mueller acknowledged that he told Castellani in correspondence dated September 20, 2006, that defendants intended to pay all of their obligations when funds became available. Mueller admitted that the September 20, 2006, e-mail indicated that defendants would sell securities to raise capital to fulfill their commitment to paying plaintiff.

### JURY INSTRUCTION DISPUTE

Defendants proposed a special jury instruction indicating that plaintiff had the burden of proving by a preponderance of the evidence that the billings were for services that were reasonably necessary and that the billings accurately stated the time actually spent on each item. The trial court declined to give defendants' proposed instruction, stating, "I think that [M Civ JI] 142.50 accurately states the law that the Plaintiff has the burden to prove what the parties intended the contract to mean. Whether certain services were or were not reasonably necessary as contemplated by the contract is a factual question . . . for the jury to decide."

The jury found that defendants breached the fee agreement by failing to make payments to plaintiff and that defendants' breach resulted in $70,000 in damages for plaintiff. The trial court awarded plaintiff a judgment consisting of $70,000 in damages, $380 in taxable costs, interest in the amount of $2,697.21 from August 3, 2009, to August 3, 2010, and interest of $804.61 from August 3, 2010, to December 3, 2010, for a total judgment "in the amount of $73,501.90 [sic]."

### POSTJUDGMENT PROCEEDINGS

Defendants moved for a new trial pursuant to MCR 2.611. Defendants asserted that they were deprived of a fair trial because the trial court failed to give their proposed jury instruction on the burden of proof and because the trial court did not allow defendants to present rebuttal testimony concerning defendants' "displeasure . . . with the amount billed." The trial court found that defendants had ample opportunity to rebut plaintiff's evidence. The court commented that defendants presented "an awful lot of testimony con-

cerning the line-by-line time entries from the itemized bills of the law firm." The court also commented that although the limitations period for filing a malpractice claim had expired, defendants had, but did not exercise, the option of asserting legal malpractice as an affirmative defense and identifying an expert witness in support of that defense. The court also determined that M Civ JI 142.01 was appropriate and accurate with respect to the burden of proof. The trial court denied defendants' motion for a new trial.

Plaintiff moved for an award of case-evaluation sanctions pursuant to MCR 2.403(O). Plaintiff submitted documentation indicating that the case-evaluation panel unanimously evaluated the case in the amount of $60,000 for plaintiff, which plaintiff accepted, and which defendants effectively rejected by failing to respond. Plaintiff submitted a "Draft for Work-in-Process" detailing its attorneys' work on the case since the case evaluation.

Defendants argued in response that plaintiff did not incur attorney fees, and was not eligible to receive attorney fees as case-evaluation sanctions, because MCR 2.403(O) does not authorize an award of attorney fees to a party that represents itself. Alternatively, defendants requested that the trial court conduct an evidentiary hearing to determine the reasonableness of the requested attorney fees after allowing the parties the opportunity to conduct discovery. Defendants argued that the requested attorney fees were excessive and out of line with the typical fee rates charged in the Midland area. Defendants filed a second pleading disputing plaintiff's calculation of attorney fees. Defendants argued that the reasonable rate for calculating plaintiff's attorney fees was the range of $195 to $200. Defendants based this argument on the median billing

rate for attorneys in Midland County of $200 and the median rate for creditor collections of $195.

At a hearing on February 4, 2011, the trial court commented that if a law firm uses its own attorneys to litigate an action against a former client for unpaid fees, the judgment it receives will be diminished by the cost of the lost opportunity of providing legal services to paying clients. The court commented that plaintiff used $81,000 worth of attorney work hours to collect a $70,000 debt; consequently, "[i]f they can't recoup the cost, or if the firm can't recoup the costs of pursuing the client that didn't pay the firm, they come out $11,000 upside down." The court asked defendants "what disincentive is there for the client to not stiff the lawyer?" Defendants responded by citing *Watkins v Manchester*, 220 Mich App 337; 559 NW2d 81 (1996), in which this Court followed caselaw that held that an attorney party who proceeded *in propria persona* in a lawsuit under the Freedom of Information Act was not permitted to recover attorney fees under MCR 2.403(O). The trial court determined that *Watkins* was distinguishable because it involved an individual attorney.

The trial court concluded that plaintiff was not a pro se litigant because it was a professional corporation represented through its agents. The court ruled that plaintiff was entitled to case-evaluation sanctions, including attorney fees, to be determined at an evidentiary hearing.

The court issued an order directing the parties to conduct discovery on the proper amount of fees in preparation for a hearing to be held on March 9, 2011. Subsequently, the parties stipulated to an order requiring the parties to take *de bene esse* depositions of the expert witnesses, Jack Pulley for plaintiff, and William Garchow for defendants, and file postdeposition briefs

within seven days from receipt of the deposition tran-
scripts. Defendants argued that plaintiff's fees and
costs incurred in pursuing case-evaluation sanctions
were not recoverable. Defendants disparaged Pulley as
incompetent and corrupt and urged the trial court to
give no credence to his opinion on the hourly rate and
amount of hours. Defendants praised their own expert,
Garchow, and argued in favor of his range of reasonable
fees from $180 to $250 an hour.

Plaintiff argued in favor of "$115,202 as a reasonable
attorney fee, based on the blended hourly rate of $296
per hour for Fraser Trebilcock's attorneys' services
from September 21, 2010, until March 3, 2011 necessi-
tated by the Defendants' rejection of the case evaluation
award." Additionally, plaintiff's brief filed before the
stipulated order included arguments that its attorneys'
respective billing rates were reasonable. Plaintiff cited
Pulley's opinion that plaintiff's billing rates were rea-
sonable. Plaintiff also cited data from the state bar that
attorney fees in the Mt. Pleasant area ranged from $175
to $400 an hour, with plaintiff's attorneys' ranges from
$175 to $320 falling within this bracket. Plaintiff de-
fended Perry's hourly rate of $320, Nicole Proulx's
hourly rate of $200, Austin's hourly rate of $260, and
Ryan Kauffman's hourly rate of $195. Plaintiff argued
that lead counsel's claim for 138.6 hours from Septem-
ber 21, 2010, until November 4, 2010, was reasonable in
view of the tasks he was required to perform. Plaintiff
argued that the factors in *Wood v Detroit Auto Inter-Ins
Exch*, 413 Mich 573; 321 NW2d 653 (1982), justified
plaintiff's attorneys' fees.

The trial court began its analysis by determining
the appropriate hourly rate for Perry's services. The
court rejected plaintiff's request of $320 as a reason-
able hourly rate, stating that MCR 2.403(O) "is not

intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." The court also rejected defendants' argument that $200 was a reasonable rate. The court considered data from the 2010 State Bar of Michigan survey regarding the median, the 75th percentile, and the 95th percentile hourly rates for attorneys based on "legal classification," years in practice, firm size, field of practice, and primary location. Perry's legal classification was equity shareholder, he had 37 years of practice, his firm had 40 attorneys, his field of practice was environmental law, and his primary locations were Ingham and Midland Counties. The data indicated that the median hourly rate for attorneys in Michigan who share these categories with Perry ranged from $200 to $270, while the 75th percentile rate in these categories ranged from $235 to $350. The trial court concluded "that given Mr. Perry's skill, experience and reputation, the 75th percentile more accurately reflects the fee customarily charged for similar legal services, and finds as reasonable a rate of $300 per hour."

The trial court addressed defendants' argument that $200 was the reasonable rate because it was the median hourly billing rate in Midland County. The trial court stated that defendants' "near exclusive reliance" on one factor was inconsistent with our Supreme Court's decision in *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008). The court found that defendants' suggested rate failed to account for Perry's skill, experience, and reputation. The court stated that the reasonable fee did not reflect "what might be reasonable in Ingham County, but rather, what is reasonable in Midland County under the particular circumstances of this case." The court stated:

It should also be noted that the median hourly billing rate for both Ingham and Midland County is $200, while the 75th percentile for each is roughly equivalent. The Court believes that the 75th percentile figure (whether in Ingham County or Midland County), coupled with an appropriate "upcharge" for Mr. Perry's considerable skill, experience and reputation, accurately reflects the fee customarily charged for similar legal services.

The court rejected defendants' argument that the reasonable rate should be determined according to the rates of local law firms that plaintiff might have retained to represent it in the action to collect unpaid attorney fees. The trial court determined that plaintiff reasonably decided to represent itself and that defendants should not have been surprised that plaintiff chose to represent itself because plaintiff's reliance on its own resources to litigate the action "was the economically rational thing to do." The court cited Perry's statement in his affidavit that plaintiff saved legal expenses that would have been incurred by outside attorneys familiarizing themselves with the facts of a case that plaintiff's attorneys already knew. The court noted that defendants did not object to the hourly rates of the other attorneys who provided services for plaintiff after the case evaluation, including Samantha Kopacz ($175), J.J. Burchman ($185), Nicole Proulx ($185), Ryan Kaufman ($185), Douglas Austin ($250), and Edward Castellani ($290).

The trial court noted that plaintiff sought compensation for 119.50 hours devoted to discovery and trial preparation, 96.8 hours of trial time, and 172.6 hours for posttrial issues. The trial court addressed defendants' challenges to an assessment of sanctions for posttrial matters. The court rejected defendants' argument that *Haliw v Sterling Hts*, 471 Mich 700; 691 NW2d 753 (2005), which precluded case-evaluation

sanctions for appellate proceedings, also precluded
sanctions for posttrial proceedings in the trial court.
The court commented that the basis for the *Haliw*
Court's exclusion of appellate costs from case-
evaluation sanctions was its recognition that MCR
2.403(O) is "trial-oriented." The trial court quoted the
statement in *Haliw* that "a causal nexus plainly exists
between rejection and trial fees and costs, the same
cannot be said with respect to rejection and the decision
to bring an appeal." The trial court reasoned that
"there is a sufficient causal nexus between Defendants'
rejection of the case evaluation and the fees and costs
associated with continuing to defend against a motion
for new trial." Regarding plaintiff's claim for attorney
fees arising from preparing and filing the motion for
case-evaluation sanctions, the trial court concluded that
these services also were necessitated by defendants'
rejection of the case evaluation and, therefore, were
recoverable.

The trial court next considered the "reasonableness
of the time spent by Plaintiff at all stages in the case."
The trial court made these findings:

• Perry devoted 37.5 hours to pretrial motions. The
trial court found this was reasonable.

• The trial court discounted three hours for Perry's
travel time between Lansing and Midland for depositions,
and six hours for Proulx's travel time for two days.

• The trial court discounted 1.4 hours that Perry
spent on a dispositive motion that was never filed. The
court also discounted 4.25 hours of a 7.1-hour entry in
which Perry's work on the summary disposition motion
was bundled with other services.

• The court discounted time that Austin spent at-
tending the trial as plaintiff's corporate representative.

• Castellani claimed $4,270 for his two days' attendance at trial, determined by his hourly billing rate. The trial court allowed only $30, according to the daily $15 witness fee.

After making these adjustments, the trial court determined that plaintiff's total number of reasonable hours spent on proceedings after the case evaluation were 284.83, which, when multiplied by the respective attorneys' hourly rates, established a baseline monetary amount of $80,434. The court considered and rejected defendants' argument that this baseline figure should be adjusted downward because no attorney fees were incurred when plaintiff did not pay anything to the attorneys involved.

Plaintiff filed a taxed bill of costs for postjudgment proceedings on August 12, 2011, including Pulley's expert witness fee and the cost of transcribing both experts' depositions. Defendants argued in response that Pulley's fees were excessive and not supported by a detailed invoice.

The trial court's Final Order Awarding Reasonable Attorney Fees and Taxation of Costs in Favor of the Plaintiff was entered on November 7, 2011. The trial court referred to its October 18, 2011, opinion granting a reasonable supplemental attorney fee for fees plaintiff incurred from March 4, 2011, to August 11, 2011. The court adopted and incorporated its October 18, 2011, opinion. The court ordered:

> In addition to the reasonable attorney fee awarded to the Plaintiff on July 21, 2011 for the time period from September 21, 2010 to March 3, 2011, the Plaintiff is granted a reasonable supplemental attorney fee award for the fees which it incurred from March 4, 2011 to August 11, 2011 in the amount of $21,253.60, plus interest thereupon through October 31, 2011 in the amount of $1,450.35. The interest upon this Supplemental Attorney Fee Award shall accrue

at a rate of $1.86 per day until December 31, 2011, at which point it shall continue to accrue until paid in full at the post-judgment interest rate established in accordance with MCL 600.6013(8).

The trial court also awarded plaintiff taxable costs for Pulley's expert witness fee ($3,000), costs of transcribing expert witnesses' testimony ($546), plus miscellaneous fees totaling $151, with interest accruing from August 3, 2009.

## I. JURY INSTRUCTION

Defendants first argue that the trial court abused its discretion by declining to give defendants' requested instruction on plaintiff's burden of proof. This Court reviews de novo claims of instructional error, but the trial court's determination whether a standard jury instruction or special jury instruction is applicable and accurate is reviewed for an abuse of discretion. *Alfieri v Bertorelli*, 295 Mich App 189, 197; 813 NW2d 772 (2012). This Court considers jury instructions "as a whole to determine whether they adequately present the theories of the parties and the applicable law." *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 626-627; 792 NW2d 344 (2010). "Instructional error warrants reversal when it affects the outcome of the trial." *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 680; 819 NW2d 28 (2011).

The trial court instructed the jury on plaintiff's burden of proof as follows:

Fraser Trebilcock Davis & Dunlap, P.C. has the burden of proof on the following:

One, that there was a contract between it and Boyce Trusts 2350, 3649, and 3650.

Two, that Boyce Trusts 2350, 3649, and 3650 breached the contract.

And three, that Fraser Trebilcock Davis & Dunlap, P.C. suffered damages as a result of the breach.

In this case, the parties do not dispute that there was a contract between them.

If you find after considering all the evidence that Fraser Trebilcock Davis & Dunlap, P.C. has proved these elements, then your verdict should be for Fraser Trebilcock Davis & Dunlap, P.C.

However, if Fraser Trebilcock Davis & Dunlap, P.C. fails to prove any one of these elements, your verdict should be for Boyce Trusts 2350, 3649, and 3650.

* * *

Fraser Trebilcock Davis & Dunlap, P.C. has the burden to prove what the parties intended the contract to mean. The contract is to be interpreted so as to give effect to the parties' intentions.

The court further instructed the jury that plaintiff had the burden of proving the parties' intentions regarding the correct interpretation of the contract. The court's instructions substantially recite M Civ JI 142.01 and 142.50. The court also instructed the jury that it "must determine the amount of money, if any, to award [plaintiff] as contract damages," and that plaintiff "must prove by a preponderance of the evidence the amount of any damages to be awarded."

Defendants argue that these model instructions failed to adequately instruct the jury that plaintiff was required to prove the legitimacy of each billed item. Defendants requested this special instruction, which the trial court declined to give:

Plaintiff has claimed a right to recover for services it provided under the contract between the parties. As part of the contract, the Plaintiff agreed to provide and Defendant agreed to pay for services that were "reasonably necessary"

for the Defendants' activities. Further, the Plaintiff agreed to bill on an hourly basis for the time spent on a matter. As the Plaintiff seeking compensation for providing services, the burden is on the Plaintiff to prove by a preponderance of the evidence that its billings are for services that are reasonably necessary and are for the time actually spent on the matter.

MCR 2.512(D)(4) provides that the trial court may give "additional instructions on applicable law not covered by the model instructions." If the court gives additional instructions, they must "be patterned as nearly as practicable after the style of the model instructions and must be concise, understandable, conversational, unslanted, and nonargumentative." *Id.*

Defendants argue that the standard instructions on burden of proof were not adequate because they did not explain that plaintiff was required to prove the legitimacy of each disputed item billed. Defendants cite *Livingston Shirt Corp v Great Lakes Garment Mfg Co*, 351 Mich 123; 88 NW2d 614 (1958). *Livingston Shirt* does not support defendants' argument that the trial court was required to specifically instruct the jury that plaintiff must prove the validity of each item billed. On the contrary, the decision indicates that once plaintiff satisfied its prima facie obligation to prove that it performed services in accordance with the contract, the burden shifted to defendants to prove that certain items billed were not proper. Defendants' reliance on *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55; 535 NW2d 529 (1995), which involved a no-fault automobile insurer's obligation to cover expenses for the insured's chiropractic treatment, is also misplaced. That case did not involve a claim for breach of contract, but rather a claim for recovery under the no-fault act, which specifically provides that no-fault benefits are payable only for "allowable expenses," which are limited to " 'all reason-

able charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation.' " *Id.* at 93, quoting MCL 500.3107(1)(a).

Defendants extensively cross-examined plaintiff's witnesses regarding items stated in invoices, such as the time involved in answering a short e-mail and reviewing files. Defendants challenged items such as Miller's work on Christmas Day 2006. Defendants presented a detailed closing argument explaining their position that several of plaintiff's items were not credible. The trial court instructed the jury that plaintiff had the burden of proving all elements of its claim, including what the parties intended their contract to mean. The trial court did not err by determining that defendants' special requested instruction was not necessary because the model instructions adequately informed the jury on plaintiff's burden of proof. There was no instructional error.

## II. EVIDENTIARY RULING

Defendants assert that the trial court erred by excluding Mueller's proposed testimony regarding defendants' dissatisfaction with plaintiff's legal services. They contend that plaintiff introduced the issue of client satisfaction into the trial and, therefore, that defendants were entitled to rebut this evidence. This Court reviews a trial court's decision to admit or exclude evidence, including rebuttal evidence, for an abuse of discretion. *Chmielewski v Xermac, Inc*, 457 Mich 593, 614; 580 NW2d 817 (1998).

"The scope of rebuttal in civil cases is within the sound discretion of the trial court." *Taylor v Blue Cross & Blue Shield of Mich*, 205 Mich App 644, 655; 517 NW2d 864 (1994). The purpose of rebuttal evidence is

to "contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same." *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996) (quotation marks and citations omitted). Here, defendants sought to rebut testimony from plaintiff's witnesses that Mueller was satisfied with plaintiff's services until defendants' problems with Goodwin arose. Austin testified that he sent an e-mail to Castellani describing Mueller as "extremely happy" that the closing documents were revised in accordance with defendants' wishes. However, Castellani testified that Mueller was "unhappy with the way his partner was interpreting those documents," which meant, in context, that the controversy did not result in the desired outcome for Mueller. Mueller was permitted to testify regarding his belief that Goodwin swindled defendants. Thus, the testimony was not calculated to leave the impression that defendants were fully satisfied with plaintiff's services. Accordingly, the trial court did not abuse its discretion by refusing to permit the proposed rebuttal testimony.

### III. CASE-EVALUATION SANCTIONS

Defendants objected to plaintiff's motion for case-evaluation sanctions on the ground that a law firm that represents itself is not entitled to receive an award of attorney fees under MCR 2.403(O). The interpretation and application of court rules presents a question of law subject to review de novo by this Court. *Kernen v Homestead Dev Co*, 252 Mich App 689, 692; 653 NW2d 634 (2002).

MCR 2.403(O) governs case-evaluation sanctions for parties who reject a case evaluation and fail to obtain a more favorable verdict at trial. The rule provides, in pertinent part:

(1) If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation. However, if the opposing party has also rejected the evaluation, a party is entitled to costs only if the verdict is more favorable to that party than the case evaluation.

(2) For the purpose of this rule "verdict" includes,

(a) a jury verdict,

(b) a judgment by the court after a nonjury trial,

(c) a judgment entered as a result of a ruling on a motion after rejection of the case evaluation.

(3) For the purpose of subrule (O)(1), a verdict must be adjusted by adding to it assessable costs and interest on the amount of the verdict from the filing of the complaint to the date of the case evaluation, and, if applicable, by making the adjustment of future damages as provided by MCL 600.6306. After this adjustment, the verdict is considered more favorable to a defendant if it is more than 10 percent below the evaluation, and is considered more favorable to the plaintiff if it is more than 10 percent above the evaluation. If the evaluation was zero, a verdict finding that a defendant is not liable to the plaintiff shall be deemed more favorable to the defendant.

\* \* \*

(6) For the purpose of this rule, actual costs are

(a) those costs taxable in any civil action, and

(b) a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation.

The parties dispute whether plaintiff, a law firm represented by its own members, is eligible to obtain an award of attorney fees under MCR 2.403(O)(6)(b).

Defendants contend that this issue is controlled by this Court's decision in *Watkins*, 220 Mich App 337, in which this Court held that the defendant, an attorney who represented himself and also received services from his law firm's staff, was not entitled to an award of attorney fees under MCR 2.403(O)(6)(b). This Court's decision in *Watkins* was substantially based on this Court's earlier decision in *Laracey v Fin Institutions Bureau*, 163 Mich App 437, 441; 414 NW2d 909 (1987), and the United States Supreme Court's holding in *Kay v Ehrler*, 499 US 432; 111 S Ct 1435; 113 L Ed 2d 486 (1991). Therefore, a proper understanding of *Watkins* requires review of these two authorities.

In *Laracey*, 163 Mich App 437, this Court held that a plaintiff-attorney who represented himself in an action under the Michigan Freedom of Information Act (FOIA), MCL 15.231 *et seq.*, was not entitled to attorney fees under the FOIA's attorney-fee provision, MCL 15.240(4) (1996 PA 553 moved the provision to MCL 15.240(6), effective March 31, 1997), because an attorney acting *in propria persona* is not an attorney within the meaning of that statutory provision. Reviewing federal cases brought under the attorney-fee provision of the federal FOIA, 5 USC 552, this Court noted that the purpose of the federal FOIA attorney-fee provision "was intended to encourage potential claimants to seek legal advice before commencing litigation," to afford claimants "the detached and objective perspective necessary to fulfill the federal act's aims." *Laracey*, 163 Mich App at 445. This Court declined to consider "whether a pro se litigant who is also an attorney possesses such perspective, for we are unpersuaded that an attorney proceeding pro se even has an 'attorney' for purposes of a fee award." *Id*. This Court stated a third rationale for denying attorney fees to a pro se FOIA litigant, namely that "the award of such fees to pro se

plaintiffs would create a 'cottage industry' for claimants using the act solely as a way to generate fees rather than to vindicate personal claims." *Id.* at 446.

In *Kay*, the petitioner, a licensed attorney, prevailed in an action against Kentucky election officials challenging state election statutes as unconstitutional. *Kay*, 499 US at 433-434. The petitioner requested attorney fees under 42 USC 1988, which gives a court discretion to "allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]" 42 USC 1988(b). The Court found that neither the text of the statute nor its legislative history provided a clear answer whether an attorney who proceeds pro se may recover attorney fees under the statute, stating:

> On the one hand, petitioner is an "attorney," and has obviously handled his professional responsibilities in this case in a competent manner. On the other hand, the word "attorney" assumes an agency relationship, and it seems likely that Congress contemplated an attorney-client relationship as the predicate for an award under § 1988. Although this section was no doubt intended to encourage litigation protecting civil rights, it is also true that its more specific purpose was to enable potential plaintiffs to obtain the assistance of competent counsel in vindicating their rights. [*Kay*, 499 US at 435-436.]

The Supreme Court concluded that the purpose of the attorney-fee provision was to ensure "the effective prosecution of meritorious claims," *id.* at 437, which would likely be compromised when a party attempts to represent itself. The Court noted that "[e]ven a skilled lawyer who represents himself is at a disadvantage in contested litigation" because he "is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile wit-

nesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom." *Id.* at 437. The Court concluded that § 1988 did not authorize an award of attorney fees to a pro se litigant because the "statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case." *Id.* at 438.

In *Watkins*, 220 Mich App 337, the plaintiff sued the defendant attorney for breach of contract and the jury returned a verdict of no cause of action. The trial court awarded the defendant attorney fees as a mediation (case evaluation) sanction for the portion of the fee award that reflected the time the defendant and his staff spent working on the case. *Id.* at 341. On appeal, this Court found "the reasoning of the *Laracey* and *Kay* Courts to be persuasive[.]" *Id.* at 344. The Court commented that the purpose of MCR 2.403(O) is "to encourage settlement by plac[ing] the burden of litigation costs upon the party who insists upon trial by rejecting a proposed mediation award." *Id.* at 344 (alteration in original; citation and quotation marks omitted). The Court concluded:

> This purpose is best served when a party hires an objective attorney—rather than serving as both litigant and advocate—to provide a "filtering of meritless claims." *Kay, supra.* Moreover, we believe that to allow litigant-attorneys to recover compensation for time spent in their own behalf, while not extending such a rule to nonattorneys would most likely contribute to the widespread public perception that the courts exist primarily for the benefit of the legal profession. Pro se litigants who are not attorneys also may suffer lost income or lost business opportunities as the result of their time spent in litigation. [*Id.* at 344-345.]

This Court acknowledged two factors that weighed in favor of allowing the defendant's claim for attorney fees: (1) the defendant retained independent counsel and discontinued representing himself during the course of the proceedings, thus alleviating concerns about the value of independent representation, and (2) the defendant was defending a lawsuit rather than pursuing his own claim against a party. This Court concluded, however, that it "[did] not find these factors to be sufficient to justify creating an exception to the general rule disallowing such fees." *Id.* at 345. Accordingly, this Court vacated the portion of the attorney-fee award that compensated the defendant attorney for the time he or his staff spent defending against the claim. *Id.*

Plaintiff argues that *Watkins* is distinguishable and its rationale does not apply where the party is a law firm represented by its own attorneys. According to plaintiff, it did not appear as a pro se litigant because a law firm is a professional service corporation, as defined by MCL 450.1282 (formerly MCL 450.222, see 2012 PA 569, effective January 2, 2013), which is unable to practice law except through licensed attorneys who are its shareholders and employees. Plaintiff also cites MCL 450.681, which prohibits the practice of law by a corporation or voluntary association. Defendants deny that plaintiff's corporate status is a material distinction with respect to the precedential effect of *Watkins*. In response, defendants rely on MCR 2.117, which governs appearances in an action by parties and attorneys and states, in pertinent part:

> The appearance of an attorney is deemed to be the appearance of every member of the law firm. Any attorney in the firm may be required by the court to conduct a court ordered conference or trial. [MCR 2.117(B)(3)(b).]

No precedential Michigan caselaw exists addressing the effect of MCR 2.117 in the context of an attorney-fee award for a law firm party represented by its own attorneys. However, the trial court recognized that the hours that plaintiff's attorneys devoted to the action may have been of greater value to the firm than the judgment for plaintiff, and if sanctions were not awarded, defendants, which refused the opportunity to resolve the action through case evaluation, would be relieved of liability for sanctions merely because plaintiff made the reasonable and economical decision to represent itself. Denying attorney fees to a law firm party represented by its in-house agents would effectively negate the value of the case-evaluation process by lowering or eliminating the risk of rejecting the evaluation. Under these circumstances, further analysis is warranted.

In *Omdahl v West Iron Co Bd of Ed*, 478 Mich 423; 733 NW2d 380 (2007), an attorney acting *in propria persona* brought a lawsuit against his former client for a violation of the Open Meetings Act (OMA), MCL 15.261 *et seq.* Our Supreme Court noted that the relevant provision of the OMA, MCL 15.271(4), provided that a party who successfully sues a public body for injunctive relief under the statute " 'shall recover court costs and *actual attorney fees* for the action.' " *Omdahl*, 478 Mich at 428 (emphasis added). The Court, *id.*, analyzed the issue whether the plaintiff incurred "actual attorney fees" recoverable under the statute:

> The meaning of these three words is central to the resolution of this case. The word "actual" means " 'existing in act, fact, or reality; real.' " [*People v*] *Yamat*, [475 Mich 49] at 54 n 15 [714 NW2d 335 (2006)], quoting *Random House Webster's College Dictionary* (1997). "Attorney" is defined as a "lawyer" or an "attorney-at-law." *Random House Webster's College Dictionary* (2001). The definition

of "lawyer" is "a person whose profession is *to represent clients* in a court of law or *to advise or act for them* in other legal matters." *Id.* (emphasis added). And the definition of "attorney-at-law" is "an officer of the court authorized to appear before it as a *representative of a party* to a legal controversy." *Id.* (emphasis added). Clearly, the word "attorney" connotes an agency relationship between two people. "Fee" is relevantly defined as "a sum charged or paid, as for professional services or for a privilege." *Id.*

The Court concluded that the statute required an agency relationship between a plaintiff and another person. *Id.* at 428-429. The Court also cited *Laracey*, 163 Mich App 437, and *Watkins*, 220 Mich App 337, in support of its decision. *Omdahl*, 478 Mich at 431. The Court's emphasis on an agency relationship as a prerequisite to obtaining an award of attorney fees arguably supports plaintiff's position in this case.

In *FMB-First Mich Bank v Bailey*, 232 Mich App 711; 591 NW2d 676 (1998), the trial court assessed sanctions under MCR 2.114(E) and (F) against the defendant, Donald Bailey, in favor of the third-party defendants, the law firm of Schenk, Boncher & Prasher, PC (SBP), and an individual attorney, James Koetje, who represented themselves.[1] *Id.* at 715-716. MCR 2.114 provides, in pertinent part:

(D) Effect of Signature. The signature of an attorney or party, whether or not the party is represented by an attorney, constitutes a certification by the signer that

(1) he or she had read the document;

(2) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well

---

[1] This Court's opinion does not specify the relationship between SBP and Koetje, but the list of the attorneys representing the parties contained in the syllabus indicates that Koetje represented himself and his law firm, Bailey and Koetje, PC, and that SBP was represented by attorney Gregory Prasher, a member of the SBP firm. *Id.* at 713.

grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and

(3) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

(E) Sanctions for Violation. If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages.

(F) Sanctions for Frivolous Claims and Defenses. In addition to sanctions under this rule, a party pleading a frivolous claim or defense is subject to costs as provided in MCR 2.625(A)(2). The court may not assess punitive damages.

MCR 2.625(A)(2) provides that "if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591." MCL 600.2591(1) provides that if the court finds that "a civil action or defense to a civil action was frivolous," the court "shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney."

The defendant in *FMB-First Mich Bank*, 232 Mich App 711, argued on appeal that the trial court's award of attorney fees to the third-party defendants under MCR 2.114(E) and (F) was improper because the court rule did not permit pro se litigants to receive attorney fees under MCR 2.114. *Id.* at 719. This Court reviewed the decisions in *Kay*, 499 US 432, *Watkins*, 220 Mich

App 337, and *Laracey*, 163 Mich App 437, but concluded that these cases were distinguishable, stating:

> Although instructive, *Watkins* and *Kay* are not dispositive. The Courts in *Watkins* and *Kay* emphasized, respectively, that the mediation rule, and the attorney fee provision of the civil rights statute, were intended to encourage parties to seek legal counsel. We see no such purpose in MCR 2.114(E) or (F). Rather, the apparent objective of MCR 2.114(E) and (F) is to deter parties and attorneys from filing documents or asserting claims and defenses that have not been sufficiently investigated and researched or that are intended to serve an improper purpose. Clearly then, the question of sanctions to discourage frivolous litigation under MCR 2.114(E) and (F) is different from the questions and interests addressed in *Kay, supra,* and *Watkins, supra.* [*FMB-First Mich Bank*, 232 Mich App at 723.]

The Court in *FMB-First Mich Bank* discussed federal caselaw and caselaw from sister states analyzing a pro se litigant's eligibility for attorney fees as sanctions for a frivolous claim or defense. The Court agreed with the principle that "[t]here is no disharmony between the deterrent purpose of MCR 2.114 and attorney fees for pro se litigants," and commented that the deterrent effect of this rule on vexatious litigation might be diminished by precluding attorney fees for victims of such litigation who represent themselves. *FMB-First Mich Bank*, 232 Mich App at 725. The Court further considered whether the plain language of MCR 2.114 and MCL 600.2591 authorized attorney fees for pro se litigants, and concluded:

> MCR 2.114(E) provides that sanctions may include "the amount of the reasonable expenses *incurred* because of the filing of the document, including reasonable attorney fees." Similarly, MCL 600.2591(2); MSA 27A.2591(2) provides that "costs and fees awarded under this section shall include all reasonable costs *actually incurred* by the pre-

vailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees." To incur means "[t]o have liabilities cast upon one by act or operation of law, as distinguished from contract, where the party acts affirmatively." Black's Law Dictionary (rev 4th ed). An attorney is "an agent or substitute, or one who is appointed and authorized to act in the place or stead of another." *Id.* [*FMB-First Mich Bank*, 232 Mich App at 725-726.]

This Court concluded from these definitions that a person "who represents himself cannot be said to have had a liability cast on himself." *Id.* at 726. This Court also concluded that "a party acting in propria persona cannot truly be said to be an attorney for himself" because an attorney necessarily "is an agent or substitute who acts in the stead of another . . . ." *Id.* This Court applied these conclusions in its interpretation of MCR 2.114(E) and (F):

MCR 2.114(E) says that if a document is signed in violation of the signature rule, "the court . . . shall impose upon the person who signed it . . . an *appropriate sanction, which may include* . . . the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees." Therefore, MCR 2.114(E) does not restrict the sanction to expenses or costs incurred. Rather, it gives the trial court discretion to fashion another appropriate sanction. In contrast, MCL 600.2591; MSA 27A.2591, incorporated by reference in MCR 2.114(F), provides that the trial court "shall award to the prevailing party the costs and fees incurred," without giving the trial court discretion to fashion another appropriate sanction. [*FMB-First Mich Bank*, 232 Mich App at 726-727.]

This Court concluded that MCR 2.114(E) allows the trial court to award attorney fees in favor of a pro se litigant, but MCR 2.114(F) does not, and remanded the case to the trial court to recalculate sanctions awarded

to Koetje and SBP in accordance with its opinion. *FMB-First Mich Bank*, 232 Mich App at 727.

Plaintiff argues that the United States Supreme Court's decision in *Kay*, 499 US at 436 n 7, contains dicta that permits attorney fees where the party is an entity represented by in-house counsel. After commenting that the word "attorney" as used in 42 USC 1988 "assumes an agency relationship, and it seems likely that Congress contemplated an attorney-client relationship as the predicate for an award under § 1988," *id.* at 435-436, the Court stated in footnote 7 of the opinion:

> Petitioner argues that because Congress intended organizations to receive an attorney's fee even when they represented themselves, an individual attorney should also be permitted to receive an attorney's fee even when he represents himself. However, an organization is not comparable to a *pro se* litigant because the organization is always represented by counsel, whether in-house or *pro bono*, and thus, there is always an attorney-client relationship. [*Kay*, 499 US at 436 n 7.]

Plaintiff cites federal cases that have relied on footnote 7 in *Kay* as authority for allowing attorney fees to a pro se attorney litigant.

*Bond v Blum*, 317 F3d 385 (CA 4, 2003), involved a copyright-infringement action arising from the defendants' use of the plaintiff's unpublished manuscript as evidence in a child-custody proceeding. In the custody dispute, the children's father, William Slavin, argued that the mother's home was an unfit environment for the children because the mother's new husband, William Bond, had written an autobiographical work admitting that he murdered his father and manipulated the juvenile criminal justice system to avoid serious consequences. *Id.* at 390-391. Bond brought an action for copyright infringement against Kenneth Blum (the

father of Bond's wife) and Blum's legal counsel for their
allegedly unauthorized use of the manuscript. The trial
court concluded that the copyright-infringement action
was frivolous because use of the manuscript in the
custody proceeding clearly came within the fair-use
exception of the copyright act, 17 USC 107. *Bond*, 317
F3d at 396-397. The pertinent issue on appeal was
whether the trial court erred by denying attorney fees
to the two law-firm defendants pursuant to a provision
of the copyright act, 17 USC 505. The trial court relied
on *Kay*, 499 US 432, to deny attorney fees on the ground
that an attorney representing himself or herself is
ineligible for attorney fees. *Bond*, 317 F3d at 398. The
United States Court of Appeals for the Fourth Circuit
disagreed and remanded, holding that the principles in
*Kay* "were applied to deny a prevailing party attorneys
fees under fee-shifting statutes, [but] do not apply in
circumstances where entities represent themselves
through in-house or *pro bono* counsel." *Bond*, 317 F3d
at 399. Citing *Kay*, 499 US 436 n 7, the court held that
"[w]hen a member of an entity who is also an attorney
represents the entity, he is in an attorney-client rela-
tionship with the entity and, even though interested in
the affairs of the entity, he would not be so emotionally
involved in the issues of the case so as to distort the
rationality and competence that comes from indepen-
dent representation." *Bond*, 317 F3d at 400. The Court
stated:

> Though representation of a law firm by one of its
> members presents an increased risk of emotional involve-
> ment and loss of independence, the law firm still remains a
> business and professional entity distinct from its members,
> and the member representing the firm as an entity repre-
> sents the firm's distinct interests in the agency relation-
> ship inherent in the attorney-client relationship. Although
> a given representation of a law firm by one or more of its

members could suffer from a lack of independence, there is no indication in this case of a relationship that tended to distort independent judgment, as existed in *Doe* [*v Baltimore Co Bd of Ed*, 165 F3d 260 (CA 4, 1998)]. [*Bond*, 317 F3d at 400.]

In *Baker & Hostetler LLP v United States Dep't of Commerce*, 374 US App DC 172; 473 F3d 312 (2006), the United States Court of Appeals for the District of Columbia Circuit held that the plaintiff, a law firm representing Canadian lumber companies in an unfair-trade dispute, was eligible for an attorney fee when the firm represented itself in a federal FOIA action to obtain documents from the defendant Department of Commerce. *Id.* at 184, citing 5 USC 552(a)(4)(E). The court relied on both *Kay*, 499 US at 436 n 7, and the plain text of the statute. The court noted that the FOIA attorney fee provision applied to "all 'complainants' who have 'substantially prevailed,' " without making an exception for a claimant law firm that represents itself. *Id.* at 184-185. The Court stated:

> Footnote 7 suggests than an in-house counsel for a corporation is sufficiently independent to ensure effective prosecution of claims, thus justifying fees. An attorney who works for a law firm certainly is no less independent than an attorney who works for a corporation. Therefore, it would make little sense to slice and dice *Kay*'s conclusion regarding "organizations" and apply footnote 7 to *some* organizations but not others. [*Id.* at 185.]

Plaintiff urges this Court to follow the example of *Baker & Hostetler* and *Bond*, and adopt the dicta in *Kay*, 499 US at 436 n 7. *FMB-First Mich Bank* lends support to plaintiff's position. This Court's decision in *FMB-First Mich Bank* rested on two premises: first, that the purpose of awarding sanctions for vexatious litigation under MCR 2.114(E) and (F) is best served by penalizing violators without regard to whether their targets

were represented by counsel or represented themselves; and second, that a pro se litigant's eligibility for vexatious-litigation sanctions depends on the language of the particular statute or court rule. Case-evaluation sanctions are akin to sanctions for vexatious litigation under MCR 2.114. The ostensible purpose of case-evaluation sanctions is to encourage resolution of cases without a trial by shifting the cost of litigation to the party that rejects the evaluation and does not obtain a more favorable verdict at trial. See also *Allard v State Farm Ins Co*, 271 Mich App 394, 398; 722 NW2d 268 (2006). This is more similar to MCR 2.114's objective of discouraging frivolous litigation than it is to the objective of attorney-fee provisions in civil rights and FOIA statutes to encourage litigants to retain independent counsel to help them more effectively assert their rights under the statutes. *FMB-First Mich Bank*, 232 Mich App at 723. Moreover, the value of objective and independent representation is less of a consideration in the case-evaluation context, in which the sanctions are a consequence of the payer's decisions. We do not perceive how the purpose of MCR 2.403(O) is furthered by excusing a rejecting party from the consequences of a rejection merely because the opposing party chose to represent itself. This is especially pertinent where, as here, the party law firm was represented by its own attorneys, who were already familiar with the underlying facts. Accordingly, we apply the dicta in *Kay*, 499 US at 436 n 7, and conclude that a law firm represented by its own attorneys is not a pro se litigant for purposes of entitlement to attorney-fee sanctions under MCR 2.403(O).

### IV. INCURRED FEES

Defendants argue that plaintiff did not incur attorney fees and, therefore, was not eligible to receive an award of attorney fees as a case-evaluation sanction

under MCR 2.403(O). They contend that caselaw precluding an award of attorney fees in excess of attorney fees actually incurred supports their argument that plaintiff did not incur any attorney fees and, therefore, is not entitled to an award of attorney fees.

In *McAuley v Gen Motors Corp*, 457 Mich 513; 578 NW2d 282 (1998), the plaintiff sued the defendants under the former Handicappers' Civil Rights Act, MCL 37.1101 *et seq.* (now known as the Persons With Disabilities Civil Rights Act), and was awarded damages and attorney fees. *Id.* at 516-517. The plaintiff moved for case-evaluation sanctions under MCR 2.403(O), but the trial court denied the motion on the ground that the plaintiff had already been awarded attorney fees under the civil rights act and, therefore, was not entitled to "punitive" damages in the form of a double attorney-fee award. *Id.* at 517. Our Supreme Court held that attorney fees are compensatory, not punitive, in nature; therefore, "the amount of recovery for such damages is inherently limited by the amount of the loss; the party may not make a profit or obtain more than one recovery." *Id.* at 520. The Court acknowledged the possibility that a litigant could receive a double recovery of attorney fees under different court rules and statutes that each serve a different policy, but concluded that "this Court, in enacting MCR 2.403 did not intend double recovery under the circumstances of this case." *Id.* at 522-523.

The underlying premise of *McAuley* is that attorney fees are compensable in nature and that double recovery or excess recovery is impermissible in most circumstances. That principle is not particularly relevant to the issue whether a pro se litigant's time devoted to litigation is compensable as an attorney fee, even if the litigant did not incur a legal, monetary debt to itself.

As already discussed in Part III of this opinion, this Court in *FMB-First Mich Bank*, 232 Mich App 711, held that a party's status as an individual attorney representing himself or herself, or a law firm represented by its own attorney, does not preclude an award of attorney fees as a sanction for vexatious litigation if the applicable statute or court rule authorizes such an award. The Court began its analysis by examining the language of MCL 600.2591, and MCR 2.114(E) and (F). The Court stated:

> However, our analysis does not end here. MCR 2.114(E) says that if a document is signed in violation of the signature rule, "the court . . . shall impose upon the person who signed it . . . an *appropriate sanction, which may include* . . . the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees." Therefore, MCR 2.114(E) does not restrict the sanction to expenses or costs incurred. Rather, it gives the trial court discretion to fashion another appropriate sanction. In contrast, MCL 600.2591; MSA 27A.2591, incorporated by reference in MCR 2.114(F), provides that the trial court "shall award to the prevailing party the costs and fees incurred," without giving the trial court discretion to fashion another appropriate sanction.
>
> Because any sanction awarded under MCR 2.114(F) is restricted to the costs and fees as described in MCL 600.2591(2); MSA 27A.2591(2), we hold that attorney fee sanctions are not available under MCR 2.114(F). In contrast, MCR 2.114(E) grants the trial court discretion to fashion an "appropriate sanction," which may include, but is not limited to, an order to pay the opposing party the reasonable expenses incurred (including attorney fees). Of course, the "appropriate sanction" may not include punitive damages under either subparagraph. MCR 2.114(E). [*FMB-First Mich Bank*, 232 Mich App at 726-727.]

MCR 2.403(O)(1) provides that the party who rejects a case evaluation and subsequently fails to receive a

more favorable verdict "must pay the opposing party's actual costs . . . ." MCR 2.403(O)(6)(b) provides that "actual costs" include "a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation." Unlike MCL 600.2591, which is incorporated by reference in MCR 2.114(F), MCR 2.403(O)(6)(b) does not restrict the trial court's authority to award a prevailing party only "the costs and fees incurred." Instead, MCR 2.403(O)(6)(b) requires the trial court to award "a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation." MCR 2.403(O)(6)(b) does not require that the attorney fee be "incurred," it requires only that the trial court determine a "reasonable" attorney-fee amount according to a prescribed method, namely, by determining the "hourly or daily rate . . . for services necessitated by the rejection of the case evaluation." Accordingly, an award of case-evaluation sanctions must include an award of attorney fees to be determined by this method.

## V. CASE-EVALUATION SANCTIONS FOR POSTJUDGMENT ACTIVITIES

Defendants argue that the trial court erred by awarding plaintiff case-evaluation sanctions for postjudgment activities and by awarding attorney fees for time spent in obtaining case-evaluation sanctions. This issue involves the interpretation and application of a court rule, which is reviewed de novo by this Court. *Kernen*, 252 Mich App at 692.

MCR 2.403(O)(8)(i) and (ii) provide that a request for case-evaluation sanctions "must be filed and served within 28 days after the entry of the judgment or entry of an order denying a timely motion" for a new trial or

to set aside the judgment. Defendants contend that this provision precludes recovery for any costs that arise from proceedings that take place after this 28-day limitations period.

Defendants rely on *Haliw*, 471 Mich 700, in which our Supreme Court held that appellate attorney fees and costs are not recoverable as case-evaluation sanctions. The Supreme Court held that "the failure of MCR 2.403(O) to expressly exclude appellate attorney fees and costs is [not] necessarily dispositive" because "the American rule permits recovery of fees and costs where *expressly authorized.*" *Haliw*, 471 Mich at 707. The Court further observed that MCR 2.403(O) is "trial-oriented," because it focuses on expenses incurred between the time of the case evaluation and the verdict. *Haliw*, 471 Mich at 707-708. The Court explained in a footnote:

> [I]n support of our conclusion that MCR 2.403(O) is trial-oriented, we note that a request for case evaluation sanctions must be made within twenty-eight days after entry of the judgment, MCR 2.403(O)(8), generally a time before the bulk of appellate fees and costs have been incurred. In addition, MCR 2.403(O)(6)(b) allows recovery of attorney fees "necessitated by" the rejection of the case evaluation. While a causal nexus plainly exists between rejection and trial fees and costs, the same cannot be said with respect to rejection and the decision to bring an appeal. Rather, appellate attorney fees and costs are arguably "necessitated by" a perceived erroneous trial court ruling.
>
> We are cognizant of prior decisions of the Court of Appeals that have construed the phrase "necessitated by the rejection" as a mere temporal demarcation. See, e.g., *Michigan Basic Prop Ins Ass'n v Hackert Furniture Distributing Co, Inc*, 194 Mich App 230, 235; 486 NW2d 68 (1992). On the basis of the language of MCR 2.403(O), however, we believe the better-reasoned approach goes

beyond a temporal demarcation and requires a causal nexus between rejection and incurred expenses. [*Haliw*, 471 Mich at 711 n 8.]

This Court held in *Troyanowski v Village of Kent City*, 175 Mich App 217; 437 NW2d 266 (1988), that the trial court properly awarded the defendant case-evaluation sanctions for attorney fees for services performed in postjudgment proceedings. This Court held that the rule authorizes attorney fees "for *all* services necessitated by the rejection of the mediation award." *Id.* at 226-227. In *Troyanowski*, the plaintiffs rejected the case evaluation and proceeded to trial, which resulted in a verdict of no cause of action. *Id.* at 219-220. The plaintiffs' motion for a new trial was denied. The trial court awarded case-evaluation sanctions that included compensation for attorney fees incurred by the defendants for the posttrial evidentiary hearing on the plaintiffs' motion for a new trial. *Id.* at 226-227. This Court held that MCR 2.403(O) permitted attorney fees "for *all* services necessitated by the rejection of the mediation award," which included the posttrial proceedings that were necessitated by the plaintiffs' decision to reject the case evaluation and proceed to trial. *Id.* at 227.

In *Young v Nandi*, 490 Mich 889 (2011), our Supreme Court issued a peremptory order reversing the portion of this Court's judgment holding that "the plaintiff is entitled to attorney fees and costs for posttrial work that occurred in the Oakland Circuit Court following the appellate process . . . ." The Supreme Court, citing *Haliw*, 471 Mich at 711 n 8, reinstated "the circuit court's ruling in this regard [because] [t]here is not a sufficient causal nexus between the postappeal proceedings and the defendants' rejection of the case evaluation." *Young*, 490 Mich at 890. The Court did not cite

the 28-day period referred to in MCR 2.403(O)(8), but rather determined that the plaintiff failed to demonstrate the requisite causal connection between the postappellate proceedings and the defendants' rejection of the case evaluation. We infer from these authorities that actual costs arising from postjudgment proceedings that occur more than 28 days after the judgment may be awarded as case-evaluation sanctions if the proceedings are causally connected to the party's rejection of the case evaluation.

Here, the trial court awarded plaintiff sanctions related both to its opposition to defendants' motion for a new trial and to its pursuit of case-evaluation sanctions. Regarding the former category, plaintiff's legal work opposing defendants' motion for a new trial was necessitated by defendants' rejection of the case evaluation. Defendants' motion for a new trial was a second attempt to obtain a favorable verdict after their first attempt resulted in a verdict higher than the case evaluation. This "second-bite-of-the-apple" would not have been necessary if defendants had accepted the case evaluation in the first instance.

However, the proceedings to obtain the award of case-evaluation sanctions were not necessitated by defendants' rejection of the case evaluation. The case-evaluation proceedings were complicated by defendants' assertion that plaintiff, a law firm represented by its own members, was not entitled to receive attorney fees and by defendants' objections to the amount of attorney fees sought by plaintiff. As previously discussed, the legal issue of plaintiff's entitlement to attorney fees for services rendered by its own attorneys was a close issue, not clearly settled by Michigan caselaw. Plaintiff requested $115,202 in attorney fees, but the trial court awarded only $80,434, reducing

plaintiff's claim by approximately 30%. Under these circumstances, we find that there is insufficient causal nexus between defendants' rejection of the case evaluation and the resources plaintiff expended claiming attorney fees. Accordingly, the supplemental attorney-fee award of $22,703.95 ($21,253.60 plus interest of $1,450.35) for expenses sustained from March 4, 2011, to August 11, 2011, is not authorized by MCR 2.403(O). Accordingly, we reverse in part the June 29, 2011, and November 7, 2011, orders to the extent they authorize case-evaluation sanctions for plaintiff's time devoted to pursuing case-evaluation sanctions.

## VI. REASONABLE HOURLY ATTORNEY-FEE RATE

Defendants argue that the trial court erred by determining that $300 was a reasonable hourly rate for Perry's services in view of all the relevant factors. A trial court's decision in determining the amount of attorney fees awarded to a party is reviewed for an abuse of discretion. *Peterson v Fertel*, 283 Mich App 232, 239; 770 NW2d 47 (2009).

In *Wood*, 413 Mich 573, our Supreme Court, considering a claim for attorney fees under the no-fault act, held that an attorney-fee award must be reasonable and that reasonableness is determined according to the following factors set forth in *Crawley v Schick*, 48 Mich App 728, 737; 211 NW2d 217 (1973):

> "(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." [*Wood*, 413 Mich at 588, quoting *Crawley*, 48 Mich App at 737.]

The Court noted with approval the *Crawley* Court's statement "that there is no precise formula for computing the reasonableness of an attorney's fee . . . ." *Wood*, 413 Mich at 588. The Court also stated that a court awarding attorney fees "is not limited to those factors in making its determination," and that "the trial court need not detail its findings as to each specific factor considered." *Id.* The Court concluded that an award "will be upheld unless it appears upon appellate review that the trial court's finding on the 'reasonableness' issue was an abuse of discretion." *Id.*

In *Smith*, 481 Mich 519, two justices (TAYLOR, C.J., and YOUNG, J.), joined by two concurring justices (CORRIGAN, J., and MARKMAN, J.) clarified the statement in *Wood* that the trial court was not required to make detailed findings regarding each specific factor. The lead opinion by Chief Justice TAYLOR stated "that in order to aid appellate review, the court should briefly address on the record its view of each of the factors." *Smith*, 481 Mich at 529 n 14. The lead opinion also stated that the factors set forth in MRPC 1.5(a) are also relevant to determining a reasonable attorney fee and overlapped the *Wood* factors. *Smith*, 481 Mich at 529. MRPC 1.5(a) lists these eight factors:

> "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> "(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> "(3) the fee customarily charged in the locality for similar legal services;
>
> "(4) the amount involved and the results obtained;
>
> "(5) the time limitations imposed by the client or by the circumstances;

"(6) the nature and length of the professional relationship with the client;

"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) whether the fee is fixed or contingent." [*Smith v Khouri*, 481 Mich at 530, quoting MRPC 1.5(a).]

The lead opinion in *Smith* stated:

We conclude that our current multifactor approach needs some fine-tuning. We hold that a trial court should begin its analysis by determining the fee customarily charged in the locality for similar legal services, i.e., factor 3 under MRPC 1.5(a). In determining this number, the court should use reliable surveys or other credible evidence of the legal market. This number should be multiplied by the reasonable number of hours expended in the case (factor 1 under MRPC 1.5[a] and factor 2 under *Wood*). The number produced by this calculation should serve as the starting point for calculating a reasonable attorney fee. We believe that having the trial court consider these two factors first will lead to greater consistency in awards. Thereafter, the court should consider the remaining *Wood*/MRPC factors to determine whether an up or down adjustment is appropriate. And, in order to aid appellate review, a trial court should briefly discuss its view of the remaining factors. [*Smith*, 481 Mich at 530-531.]

Contrary to defendants' implied argument, these authorities do not cap an attorney's reasonable hourly fee at the highest amount supported by the locality. The trial court gave due consideration to the median, the 75th percentile, and the 95th percentile rates of attorneys with similar characteristics as Perry in the Midland area, the Lansing area, and in all of Michigan. However, the court decided that Perry's experience and skill justified a premium rate consistent with the 75th percentile of comparable attorneys in Michigan. The court did not abuse its discretion by making this deter-

mination; its decision is within the range of principled outcomes. *Taylor v Currie*, 277 Mich App 85, 99; 743 NW2d 571 (2007).

Defendants also argue that the trial court improperly awarded plaintiff attorney fees in an amount higher than the jury's verdict for plaintiff. In *Smith*, the lead opinion stated:

> Factor 3 under *Wood*, 413 Mich at 588, and factor 4 under MRPC 1.5(a), is "the amount in question and the results achieved." Although this factor may be relevant in other situations, we conclude that it is not a relevant consideration in determining a reasonable attorney fee for case-evaluation sanctions. As stated, the purpose of MCR 2.403(O) is to encourage serious consideration of case-evaluation awards and penalize a party that "should have" accepted the case's evaluation. The rejecting party that does not achieve a more favorable result must pay reasonable attorney fees "for services necessitated by the rejection . . . ." MCR 2.403(O)(6). It would be inconsistent with MCR 2.403(O) to reduce the accepting party's reasonable attorney fees "for services necessitated by the rejection" on the basis of the amount in question or the results achieved. If we were to do so, the accepting party could have properly evaluated the case's value, yet be forced to incur additional fees, potentially in excess of the case's value. Reducing the accepting party's reasonable attorney fees necessitated by the rejection because they exceed or are disproportionate to the value the accepting party correctly assessed undermines the rule. MCR 2.403(O) penalizes the rejecting party who incorrectly valued the case, not the accepting party who correctly assessed the case's value at a much earlier and more efficient time. Reducing the accepting party's reasonable attorney fees on the basis of proportionality simply encourages the inefficiency the rule seeks to combat. [*Smith*, 481 Mich at 534 n 20 (opinion by TAYLOR, C.J.).]

Defendants contend that a majority of the justices in *Smith* held that the "results obtained" factor remains a significant factor in determining a reasonable attorney

fee under MCR 2.403(O). Justice CORRIGAN stated in her partial concurrence, partial dissent that the "results obtained" factor should not be eliminated as a factor in determining a reasonable attorney fee. *Smith*, 481 Mich at 538. Justice CORRIGAN stated that there is "no justification" for concluding that the term "reasonable attorney fee" in MCR 2.403(O) means anything different than it does in any other context; therefore, the results obtained is a relevant factor in determining whether an award is reasonable. *Id.* at 538-539. The three dissenting justices did not address the results-obtained factor. Accordingly, the results-obtained factor is either of little relevance to the determination of a reasonable attorney fee or only one of many factors to be considered. In the absence of any authority expressly prohibiting an attorney-fee award from being higher than the verdict amount for the prevailing party, we conclude that the trial court's award of $80,434 in attorney fees is not outside the range of principled outcomes, notwithstanding that the jury's verdict was only $70,000. *Taylor*, 277 Mich App at 99.

We affirm the judgment for plaintiff in Docket No. 302835. We affirm in part the award of case-evaluation sanctions in Docket Nos. 305149 and 307002, but reverse the award of case-evaluation sanctions to the extent that it encompasses services related to the pursuit of case-evaluation sanctions. The case is remanded for the recalculation of case-evaluation sanctions consistent with this opinion. We do not retain jurisdiction.

BORRELLO, J., concurred with FITZGERALD, J.

MURPHY, C.J. (*concurring in part and dissenting in part*). I am in accord with the majority with respect to the jury instruction and evidentiary issues; however, I respectfully disagree with the majority concerning

whether plaintiff is entitled to an award of attorney fees as case-evaluation sanctions. I would hold that there was no "attorney fee" to award plaintiff for purposes of MCR 2.403(O)(6)(b). Accordingly, I concur in part and dissent in part.

Under MCR 2.403(O)(6)(b), a case-evaluation award of actual costs includes "a reasonable *attorney fee* based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation." (Emphasis added.) In *Omdahl v West Iron Co Bd of Ed*, 478 Mich 423; 733 NW2d 380 (2007), the Michigan Supreme Court construed the Open Meetings Act (OMA), MCL 15.261 *et seq.*, and in particular MCL 15.271(4), which provides for the recovery of "costs and actual attorney fees" in a successful action against a noncompliant public body. In *Omdahl*, the plaintiff was an attorney who proceeded *in propria persona*, and he won a judgment against the defendant for violating the OMA. However, the trial court denied the plaintiff's request for attorney fees. This Court reversed the trial court's ruling in a divided decision. *Id.* at 424-425. Our Supreme Court, in reversing the judgment of this Court, held "that because an attorney is defined as an agent of another person, there must be separate identities between the attorney and the client before the litigant may recover actual attorney fees." *Id.* at 424.

The *Omdahl* Court, relying on dictionary definitions, reasoned that an "attorney" is a "lawyer" or an "attorney-at-law," and a lawyer is defined as being in the profession of representing clients in court or advising or acting for them in various legal matters, while, similarly, an attorney-at-law is defined as a court officer authorized to appear in court as a party's representative in a legal controversy. *Id.* at 428. The Court observed that "[t]he courts of this state as well as the

federal courts have, in deciding cases of this sort, focused on the concept that an attorney who represents himself or herself is not entitled to recover attorney fees because of the absence of an agency relationship." *Id.* at 428-429.

In challenging the dissent's position, the majority in *Omdahl* noted that "[t]he dissent claims that the definitions of 'attorney' do not explicitly require an agency relationship; however, the most reasonable interpretation of the term does require such a relationship, and the dissent does not cite a single instance in which 'attorney' is defined in any context other than an agency relationship." *Id.* at 428 n 1. The Court further stated:

> While the dissent criticizes the majority for relying on cases interpreting the statutory language "reasonable attorney fees," and claims that the difference between actual attorney fees and reasonable attorney fees is significant, we note that our focus in this case is on "attorney" not "actual." In this respect, the dissent's attempt to distinguish *Laracey* [*v Fin Institutions Bureau*, 163 Mich App 437; 414 NW2d 909 (1987),] fails. *Laracey* is relevant because both *Laracey* and the instant case involve attempts by an attorney appearing *in propria persona* to recover attorney fees. We find *Laracey* persuasive for the relevant portion of its holding, which states that "both a client and an attorney are necessary ingredients for an attorney fee award." *Laracey, supra* at 446. [*Omdahl*, 478 Mich at 430 n 4.]

" 'The fact that [a] plaintiff is admitted to practice law and available to be an attorney for others, does not mean that the plaintiff has an attorney, any more than any other principal who is qualified to be an agent, has an agent when he deals for himself.' " *Id.* at 430, quoting *Laracey*, 163 Mich at 445 n 10, quoting *Duncan v Poythress*, 777 F2d 1508, 1518 (CA 11, 1985) (Roney, J., dissenting).

The *Omdahl* Court also relied on *Watkins v Manchester*, 220 Mich App 337; 559 NW2d 81 (1996), which construed "the attorney fee provisions in the case evaluation rules[.]" *Omdahl*, 478 Mich at 431. Our Supreme Court found that while *Watkins* interpreted MCR 2.403(O), which had somewhat different language than the OMA statute given the reference to "reasonable" and not "actual" attorney fees, the panel nonetheless "focused on the availability of any attorney fees when the agency relationship was missing[.]" *Omdahl*, 478 Mich at 431.

The *Omdahl* Court also quoted with favor *Falcone v Internal Revenue Service*, 714 F2d 646, 648 (CA 6, 1983), agreeing with *Falcone* that " '[b]oth a client and an attorney are necessary ingredients for an award of fees[.]' " *Omdahl*, 478 Mich at 431. The *Omdahl* Court additionally relied on *Kay v Ehrler*, 499 US 432, 435-436; 111 S Ct 1435; 113 L Ed 2d 486 (1991), observing that *Kay* "noted that the use of the word 'attorney' assumed an agency relationship and found it likely that Congress intended to predicate an award under [42 USC 1988] on the existence of an attorney-client relationship." *Omdahl*, 478 Mich at 431. Our Supreme Court then concluded:

> Thus, with these definitions and the caselaw we have discussed in mind, it being clear that there was no agency relationship between two different people, there was no lawyer-client relationship as understood in the law. Therefore, there were no "actual attorney fees" for Omdahl to recover under MCL 15.271(4). [*Id.* at 432.]

I conclude that *Omdahl* dictates reversal of the trial court's award of attorney fees to plaintiff. As stated by plaintiff law firm, a professional services corporation like plaintiff provides professional legal services through its licensed attorneys. A law firm necessarily

acts through its attorneys and other personnel. The firm's attorneys are thus agents of the law firm, and this agency relationship exists because the attorneys are employed by the law firm, not because the law firm is a client of its attorneys. And "[u]nder fundamental agency law, a principal is bound by an agent's actions within the agent's actual or apparent authority." *James v Alberts*, 464 Mich 12,15; 626 NW2d 158 (2001). Stated otherwise, when an attorney acts within his or her actual or apparent authority, the firm employing the attorney has acted. "The appearance of an attorney is deemed to be the appearance of every member of the law firm." MCR 2.117(B)(3)(b). Accordingly, "a client's employment of one member of a law firm is deemed to be the employment of the firm itself." *Plunkett & Cooney, PC v Capitol Bancorp Ltd*, 212 Mich App 325, 329; 536 NW2d 886 (1995); see also *Mitchell v Dougherty*, 249 Mich App 668, 681; 644 NW2d 391 (2002). Therefore, when a law firm's attorney appears in litigation on behalf of a client, all of the firm's attorneys are deemed to have appeared, and the law firm itself is deemed to be employed by the client. Thus, if a law firm itself becomes embroiled in litigation as a party litigant, and if the firm proceeds in the litigation using one or more of its own attorneys, the law firm has in theory employed itself to go forward in the action. In such circumstances, the law firm is effectively proceeding *in propria persona*, and the firm does not have an identity that is separate from its attorney(s) for purposes of establishing an attorney-client relationship. When an attorney is already an agent of the law firm because of his or her employment status with the firm, the use of that attorney to handle litigation in which the firm is a party is no different than the employee or agent of any other company handling a matter in court; the

action is being pursued *in propria persona*. This necessarily means that there is an absence of a true attorney-client relationship, as required to be entitled to an "attorney" fee. *Omdahl*, 478 Mich at 432. Plaintiff and the attorneys who handled the litigation for plaintiff did not have a "lawyer-client relationship as understood in the law." *Id*. Plaintiff dealt for itself the only way possible, through its personnel. *Id*. at 430.

Plaintiff argues that a corporation such as plaintiff is a separate entity under the law, which distinguishes it from its attorneys; therefore, there were separate identities and the *Omdahl* requirement of an agency relationship was present. I agree that a corporation constitutes an artificial entity that is separate and distinct from the holders of the corporation's individual stock. *Bourne v Muskegon Circuit Judge*, 327 Mich 175, 191; 41 NW2d 515 (1950). However, this general principle does not mean that an incorporated law firm is separate and distinct from its attorneys *in the context of determining whether an attorney-client relationship exists*, given that a firm's attorney is an agent of the firm because of his or her employment status and considering that an appearance by a firm's attorney is an appearance by all of the attorneys in the firm, resulting in employment of the law firm by the client; the client and the law firm cannot be one and the same.

The majority suggests that *Omdahl* is distinguishable because the OMA referred to "actual" and not "reasonable" attorney fees, but *Omdahl* directly confronted and rejected that argument as raised in the dissenting opinion in *Omdahl*, noting that its focus was on the presence or absence of an attorney-client relationship, not the term "actual." *Omdahl*, 478 Mich at 430 n 4. Additionally, *Omdahl* favorably cited *Watkins*,

220 Mich App 337, employing its agency-relationship analysis, and *Watkins* concerned the very case-evaluation provision at issue here. *Omdahl*, 478 Mich at 431.

The majority's reliance on *FMB-First Mich Bank v Bailey*, 232 Mich App 711; 591 NW2d 676 (1998), is misplaced. First, it predates *Omdahl*, which governs. Regardless, *Bailey* is entirely consistent with *Omdahl*, and it actually provides strong support for my dissenting view. This Court ruled "that pro se parties are not eligible for attorney fee sanctions under MCR 2.114, and we vacate the order to the extent that it awards pro se litigants attorney fees." *Bailey*, 232 Mich App at 719. In *Bailey*, the litigation involved, in part, a party attorney, James Koetje, and a party law firm, Schenk, Boncher & Prasher, PC (S, B & P), and the defendant argued that the trial court erred by awarding attorney fees under MCR 2.114 to Koetje and S, B & P because they were pro se litigants. *Id.* at 714-715, 719. The Court observed:

> One who represents himself cannot be said to have had a liability cast on himself. A person cannot impose a liability for attorney fees on oneself. Thus, Koetje and S, B & P did not "incur" attorney fees, because they represented themselves. Similarly, the definition of "attorney" seems to preclude the possibility of incurring attorney fees unless someone is represented by a separate individual. Because an attorney is an agent or substitute who acts in the stead of another, a party acting in propria persona cannot truly be said to be an attorney for himself. It is thus impossible to incur attorney fees when one is not represented by an attorney, i.e., someone other than the actual party. [*Id.* at 726.]

The Court, however, found that sanctions could still be awarded under MCR 2.114(E), *id.* at 727, and noted the provisions of MCR 2.114(E) which provides:

> If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, *an appropriate sanction, which* **may** include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages. [Emphasis added.]

The Court reasoned that MCR 2.114(E) does not restrict the sanction to expenses or costs incurred, such as attorney fees; "[r]ather, it gives the trial court discretion to fashion another appropriate sanction." *Bailey*, 232 Mich App at 726-727. The *Bailey* panel ultimately concluded, "We vacate the sanction order to the extent that it awards attorney fees to pro se litigants. We remand for further consideration of sanctions in accordance with this opinion." *Id.* at 728.

Given that S, B & P was a pro se litigant, I can safely and confidently assume that one or more of its attorneys handled the litigation, as was the case here; therefore, *Bailey* provides on-point precedent supporting reversal of the trial court's ruling on the basis that there was no attorney-client relationship. I would reverse the trial court's decision to award attorney fees to plaintiff, considering that there was no "attorney fee" for purposes of MCR 2.403(O)(6)(b) in light of the missing element of an attorney-client relationship.

I respectfully concur in part and dissent in part.